MOXLEY (HAYMAN v.). See Case No. 6,-266.

MOXLEY (NAN v.). See Case No. 10.007.

MOXLEY (UNITED STATES v.). See Case No. 15,830.

## Case No. 9,895.

### MOXON et al. v. The FANNY.

[2 Pet. Adm. 309.][1]

District Court, D. Pennsylvania. 1793.

PRIZE — VESSEL TAKEN IN NEUTRAL WATERS — VIOLATION OF NEUTRALITY LAWS — RESTORATION.

1. The brigantine Fanny was captured within five miles of Cape Henry, and brought into the port of Philadelphia. The owners of the Fanny claimed her, and prayed that she might be restored to them, she having been taken within the territorial jurisdiction of the United States, but the court dismissed the libel for want of jurisdiction.

[Cited in The Lotty. Case No. 8,524.]

See Findlay v. The William [Case No. 4,790].

[2. Cited in The Gilbert Knapp. 37 Fed. 211, to the point that the admiralty has cognizance of matters on land if they are incidents to those at sea.]

[This was a libel by John Moxon and others against the brigantine Fanny (Michael Pile, master).]

The libel states: That the libellants were the true owners of the brig Fanny, now in the port of Philadelphia. That on the night of the seventh of May last, the said brig, being on her voyage from the island of Jamaica to Baltimore and near Cape Henry, was hailed in the English language, from a small schooner, who enquired if they wanted a pilot; that they answered in the negative, and not suspecting they were near an enemy, continued their course all night, and at daybreak next morning, found themselves within five miles of Cape Henry, when and where they were boarded and made prize of by sundry armed men, belonging to the armed schooner Sans Culottes, commanded by J. B. P. A. Ferey, and the officers and the crew of the said brig made prisoners. That the cargo enumerated in the libel was the property of the persons respectively therein named, being the libellants. That they do not admit that the said schooner was duly commissioned to capture British vessels or property. That the said brig at the time of her capture was on neutral ground, within the territorial jurisdiction and under the protection of the United States, who are now at peace with the king and people of Great Britain: and the said J. Ferey had no authority or permission from the United States to capture British vessels or property within that distance from the sea coast, to

which by the laws of nations and those of the United States the right and jurisdiction of the United States extend. They, therefore, pray restitution of vessel and cargo, and damages for detention.

To this libel J. B. P. A. Ferey put in a plea to the jurisdiction of the court: and in his plea sets forth: That he was at the time of the capture of the brig Fanny duly commissioned by the French republic, as captain on board the armed schooner Sans Culottes, belonging to citizens of the said republic, to attack all the enemies of the said republic wherever he might find them, &c., which commission he is now ready to shew, &c. That so being commissioned he took as prize, the said brig, &c., belonging to British subjects, at open war with the French republic, and brought her as prize into the port of Philadelphia, &c. That by the laws of nations, and the treaty of amity and commerce with France, it doth not pertain to this court to hold plea, &c. He, therefore, prays to be hence dismissed, and the brig and cargo discharged from arrest, &c. A copy of the commission, as stated in the plea, was shewn and by consent, was admitted.

The libellants reply, that the libel ought not to be dismissed, because: (1) That the brig Fanny and cargo were unlawfully seized and taken within the territorial limits of the United States, by the said J. B. P. A. Ferey, and divers citizens of the United States, the said United States then and now being at peace with the king and people of Great Britain. (2) That the said schooner Sans Culottes was unlawfully armed, manned, victualled and fitted out within the United States, with the citizens thereof on board her, to cruize within the domain and territorial jurisdiction thereof, against the king and people of Great Britain, and against the citizens and subjects of Holland, with whom the United States were then and now are at peace. (3) They deny that the said J. B. P. A. Ferey was duly commissioned; or that the schooner Sans Culottes belonged to the citizens of France, at the time of the pretended commission; or that the French republic then had any authority to grant a commission for her to cruize, as an armed vessel, against the friends of the United States. They, therefore pray sentence according to the prayer of the libel.

The defendant rejoins by protestation, &c. and relies on his plea as before stated. The several matters mentioned in the replication in addition to those in the libel were abandoned, or were not insisted on by the advocates for the libellants, and the cause put on the ground of the libel. The arguments were much the same with those in the former cause of Findlay v. The William [Case No. 4,790], with the addition of some new matter; and, therefore, I consider this in the nature of a re-hearing of the point determined in that cause.

The arguments, either explanatory or additional, seem to be: (1) That by the more ancient authorities (Lex Merc. 206, 207, 227; Inst. Adm. 7, 219; Molloy, 41, bk. 1, c. 2, § 21), it appears that, if at that day, the prize was carried into neutral territory, the admiralty might restore, and the owners were not divested of the property, if it were not carried infra praesidia of the captors, and condemned in a court of admiralty. It is allowed that the custom of selling prizes in neutral ports, has altered this law; but the authorities shew that, before the custom of selling, the courts had jurisdiction, and if the property were not changed, before this practice of selling took place, it is not changed here, because taken in neutral territory, and the capture unlawful; and, therefore, the courts here have the jurisdiction the admiralty possessed before this custom of selling prevailed. (2) That the act of taking being illegal, it can give no right. Every sovereign is owner of the soil of his country, and the jurisdiction over a certain extent of sea-coast, and this jurisdiction should be acknowledged by the whole world. And though it is not well settled how far territorial limits extend on sea-coasts, the most approved writers agree the distance to be three leagues. That within these limits there is no war; and, therefore, there can be no prizes lawfully made. That the laws of nations forbid fitting out privateers in a neutral country, or capturing within its limits, friends of the neutral. These acts are penal and liable to punishment. If the property is not restored and compensation made, it is a cause of war, as it also is if neutral territory is invaded by the nations respectively affected by either of these circumstances. And, if we shall be under the necessity of paying for the property taken in our territory, the captors will, in part, carry on their war at our expense. It is acknowledged, that we have no concern with captures lawfully made; but this is no lawful capture, and we have a right to exercise our jurisdiction in this case. The proper means to do this is through our courts of justice, who have cognizance of all invasions of our jurisdiction and territorial rights. (3) That we do not here investigate the question of prize, but pursue a remedy for a marine trespass, a subject evidently within the jurisdiction of our admiralty courts. (4) That, however it may be with the sovereignties of other nations, ours is divided into executive, legislative, and judiciary; and by the constitution, the judiciary have cognizance of all cases of admiralty and maritime jurisdiction. It, therefore, rests with them to give a remedy in all such cases, and this court is particularly by law vested with authority where an alien sues for a tort only in violation of the laws of nations, &c.—and this is a case falling under that description. (5) Much argument and discussion were used on the subject of Palachi's Case [1 Rolle, 175]. It was said that this case was originally a prosecution for piracy under a British statute; and therefore

the reasoning and determination of the judges do not apply to it. But by the same case, as reported in Bulstrode [3 Bulst. 28], it appears that a prohibition was refused to the admiralty who took cognizance civilly and adjudged restitution. That the cases on which the report in the Exposition de Motifs, &c. was made were different from the present case; and, therefore the positions of those who made that report being founded on the cases under their consideration, do not, in any respect, apply to the case in question. It was, however, agreed that whatever be the proper decision as to legality of prize, or limits of territory, the question always recurs.—What department of government is vested with the power of enquiring into it, and giving the remedy? To these were added many arguments of inconvenience and policy. The prize here may be sold without inquiry, if this court will not make it; but in France their courts would examine into circumstances and prevent injustice. If the capture is wrongfully made, the captor will not carry it to France; and even there, in the case of the most valuable ship, there is nothing to which the injured party can resort but the privateer bond; therefore, if carried to France, restoration would be made if the capture is illegal. But here if the court will not take cognizance, it must be sold, and there is an end of redress. By bringing property into our ports captors submit to our jurisdiction. That the silence of the books is owing to admiralty cases not being published, and cases of plunder brought into neutral ports are uncommon.

On the part of the captors the arguments made use of in the case of Findlay v. The William [supra], were repeated, and much was said in answer to the reasoning of, and authorities produced by, the advocates for the libellants.

The doctrines laid down in the exposition, &c. were relied on as to the law of nations, and the treaty was called the sheet-anchor on which the captors depended. It was contended that the treaty forbids the courts from interfering, but the right of diplomatic interference was not denied; nor were the arguments on this side extended further than as the subject related to captures by one enemy from another. An objection was taken to the parties libellants, who, it was said, had no power to sue and recover on the point of violation of territory, which did not give rights to parties at war, but merely affected the neutral nation. It was acknowledged that a capture in a neutral territory was an offense to the neutral, and that the neutral government might order restitution. But this is a matter of state policy, not of judicial proceeding. If the United States were a party, it might alter the case; but here are only belligerent parties. That as to the Case of Palachi, in 3 Bulst. 28, it must be misreported, or some circumstances existed, not now appearing, as it differs in the general positions from those laid down by my Lord Coke in his Institutes, where civil as well as criminal proceedings are mentioned. That the authorities out of Sir Leoline Jenkins are all founded on references from the king to him, and he does not give judgment, but refers the remedies to royal authority.

The doctrine of infra praesidia was denied, and it was asserted that the property was vested by capture as to the enemy; that though it may be trespass as to the neutral, the taking vests the right in the captor, and the trespass done to the neutral is a subject for him to enquire into and obtain redress, but not for the party at war. And it appears by the British instructions to their privateers, that they are of opinion that a prize may be taken on neutral ground if the government of the neutral permits it. That if there are no adjudged cases in favour of the captors, there are none on the other side, and both are on an equal footing in this respect.

One of the advocates entered largely into the point of territorial limits, and shewed the uncertainty in which it was involved. It was said that these limits must be settled by treaty; and by treaty, if it were deemed right, a power in the neutral courts to judge of prizes taken in neutral bounds ought to have been vested, for it cannot be assumed without the consent of the sovereign of the party making the capture. The inequality of remedy was also insisted on; there can be no reciprocity, where the one party may be obliged to restore, but cannot have condemnation of the capture.

I have re-considered the arguments adduced on a former occasion as well as those brought forward in this case. I shall say nothing on the new ground taken in the replication, because it is not insisted on by the replicants. This being a public point, I have been desirous of hearing all that could be said upon it; If I am still of the same opinion I delivered in the former case, it is not because I indulge the petty and inflexible pride of consistency, but because I am not convinced that my former decree was erroneous. It is not with pleasure, that I continue to differ with the advocates for the libellants in this or the former cause: I have a sincere deference for their opinions in general, but my duty will always prompt me to follow the impressions the subject produces in my own mind. If these are erroneous they must be set right by an appeal to a superior tribunal, in whose decision I shall very cheerfully acquiesce. I shall be obliged to be more diffuse than, in common cases I wish to be, as the subject has been ably and extensively discussed by the advocates on both sides of the question, and it is a point of public consequence. I will avoid, however, as much as possible, going into minute investigation, and confine myself, chiefly, to general principles.

The doctrine, advanced on the part of the libellants, that it is necessary for the complete transfer of property to the captors, that the prize should be carried into their terri-

tories and there condemned, seems to present itself as the first object of investigation. It appears to me that much of the argument, founded on the authority of the old cases is built on this doctrine. I am not satisfied that this opinion was at any time well founded. If the old cases produced shew that prizes brought in solo amici, were considered as subjects of cognizance in neutral courts, because the capture was not complete, not being carried infra praesidia of the captors, I could not be convinced that they should have the weight contended for, if they were not more explicit and certain than they appear to be. Lex Merc. 206, 7, 227. And I think that on a careful inspection of most of these cases it will be seen that the civilians (Molloy, 41; Inst. Adm. 219) then founded their opinions as to admiralty jurisdiction, in captures brought in solo amici, upon this principle. If this were the case, these authorities ought not to govern us; cessante ratione, cessat lex. To adduce them to shew that courts now have the authority exercised when the doctrine of infra praesidia prevailed, in cases of illegal captures, does not strike me forcibly; because, if the authority was then assumed on fallacious principles, it amounts to nothing more than to found one error upon another.

The general positions (Grotius, de Jure B. lib. 3, c. 6, § 3, note 3), that the property taken is not changed until brought into the ports of the captors, appears, even by the old authorities, merely to relate to the rights of postlimine and salvage, on re-capture. The instance of captures at sea, given by Grotius, recognizes the true reason on which ancient writers found their opinions, viz. that "the capture is then complete when all hope of recovery is lost." It is lost if carried within a fleet of the sovereign of the captor, or, "by the modern law of nations, it is sufficient if these kinds of things have been during twenty-four hours in the power of him who took them from his enemy." Freem. 40. Goods taken from an enemy on land and recaptured, shall be the property of the recaptor, unless re-taken the same day and claim put in before sunset. Bynker de R. B. lib. 4. Goods or ships must be brought into port and continue infra praesidia a night, "so that all hope of recovery be lost."

It is then, only required that "all hope of recovery be lost," to establish the principle; and the going into the territory, &c. are only mentioned as instances and not requisites; so that it does not appear by these authorities, some of which are cotemporary with Palachi's case, that it was essential to a complete capture, that it should be carried into the captor's territory. Burlamaqui, 233, 234. Burlamaqui has cleared up this point in his Principles of Politic Law (chapter 7, §§ 16, 17): "The prizes taken from an enemy become the property of the captor as soon as they are taken. The truth is, this distinction" (carrying or not infra praesidia) "has

been invented only to establish the rules of the right of postlimine or the manner in which the subjects of the state, from whence something has been taken in war, re-enter upon their rights, rather than to determine the time of the acquisition of things taken by one enemy from another."

In the case of Goss v. Withers, in 2 Burrows, 683 (Just. Inst. bk. 2, tit. 1, § 17), this doctrine is discussed. It is there shewn, that the enemy acquire a property by the mere occupation, where all hope of recovery is lost. A case mentioned in page 694 of that book, was on a former occasion relied on, as bearing on the case in question.

Restitution to the British owner was decreed against a vendee or re-captor, in the time of Charles the Second, of a ship having been fourteen weeks in the possession of the enemy, and re-taken by a British privateer. Another is there cited from Lucas, p. 79, upon the same principles, against a vendee, after a long possession, two sales and several voyages. Yet Woodeson (volume 2, p. 441) expressly says, that "by alienation of a capture to subjects of a neutral power, the property is become irretrievable as to the original proprietors," and vide post, 443. But Lord Mansfield justly observes, that most of the rules on this subject are arbitrary, and not the object of reason alone. They are contrivances of nations in favour of their own subjects and to prevent too easy transfers to neutrals. Every nation (Burlamaqui, 224), for the benefit of its own citizens, makes what rules it pleases as to the recovery by the owner of the property re-taken. But what has a neutral court to do with such arrangements? They relate to the adjustment of salvage between subjects of the same nation, but have no operation between one enemy and another. For with respect to them, "the ship is lost by the capture though she be never condemned at all, nor carried into any port or fleet of the enemy." Goss v. Withers, 2 Burrows, 683. If then the ship is lost to the enemy, from whom it is captured (the mere capture being held sufficient to ground a claim of insurance) what new title can he acquire by coming into the port of neutral and becoming party to a suit for recovery of his former property? The court were of opinion, in the case first mentioned, that the question "whether by the capture the property was or was not transferred to the enemy," could only happen in two cases. 1st. Between the owner and a neutral purchaser. 2d. Between the owner and the recaptor. If a third case had existed, my Lord Mansfield was too accurate not to have added it, to wit—between the owner and his enemy in a neutral court. But he had given a contrary opinion, and knew no such case ought to occur. Vide Bynkers. de R. B. bk. 1, c. 15, p. 191.

It therefore seems to me that cases, grounded on the doctrine of infra praesidia, and condemnation in a court of admiralty of the captors, are not sufficient guides in this ques-

tion. All that is said about this doctrine is not to be understood as relating to the parties at war; for, as to them, the capture is complete when made. But in support of the rights of postlimine, in cases of re-capture, this necessity of bringing into port, condemnation, &c. is asserted to settle the matter between the former owner and the recaptor. So that the salvage paid is different at the will of nations who make regulations obligatory on their own subjects, according to the time the prize had been in the enemy's possession. These are different in different nations. Vide 2 Wood. 441–443. A neutral subject has nothing to do with them, except he becomes a purchaser; he must then examine into them merely to see what situation he will be in as to his purchase, if it falls into the hands of the nation to whom the former owner is a subject. But how this right of postlimine would operate in such case is not the subject of enquiry in a neutral court. It has no relation to a dispute between enemy and enemy, and never can operate so as to warrant their carrying on against each other, in a neutral country, a war of suits. But whether a sale be or be not good, is not the present question: it is a capture by one enemy from another, which gives, at least, prima facie, the right. It is not material now, whether, as some contend, the person making a capture has only a possessory or an absolute right. 2 Burrows, 689. Be this how it may, as to the captor, the former owner is by the capture totally divested of his property; the captor takes it as a subject of a belligerent nation, and in the first instance for his nation. 2 Wood. 446, 447. The intervention of a court of admiralty of the captor is made necessary, not to give validity to the capture but to inquire into the circumstances, and give the captor his reward by transferring to him the right of the nation, and the court will not vest it in him if the capture is improperly made. This view of the matter shews in a stronger light, that the whole is a national concern. Neutral courts or private individuals, are not clothed with authority to vindicate or carry on national contests; but these disputes must be settled by sovereignties alone. The capture being originally for the nation at war, is national property, and as such, the neutral, anticipating the justice of the belligerent sovereign, whose subject has done the wrong, and at the same time vindicating the rights of its own sovereignty and neutrality, may seize and restore the prize when the neutral territory is invaded in making the capture, if the property is within its power: if not, he may demand restitution and satisfaction from the sovereign of the captors. If this demand is refused, he may obtain what he requires, by reprisals or war—modes of redress far beyond the reach of judiciary tribunals.

The reasoning founded on the supposed illegality of the prize is a petitio principii. For the question is how that is to be ascertained? The discussion about neutral territory is another question, which lies between the sovereign of the captor and that of the neutral nation. Grotius, de Jure B. lib. 3, c. 6, § 24. The rights of neutrality were not established for the benefit of belligerent parties. They only affect the neutral; and invasion of these rights is an offence to him and not to the party at war. When Cheline who had a commission from the French, then at war with the Dutch, took a ship of the latter near the port of Dublin, the capture was not held piratical, or as to the Dutch unlawful. But it was criminal and unlawful as to the English sovereign, who was a neutral, and the ship was lying under his protection. 2 Wood. 442; Sir L. Jenkins, 754. The party whose property is taken in a neutral country calls on the neutral sovereign to assert these rights, for the protection of those within the territory. If this cannot be done by negociation, it resorts to force, the only law among sovereigns where they differ upon public points. There seems, therefore, no small weight in the objection made to the party libellant. It does not seem proper that a suit, founded on the ground of invasion of neutral territory, should be maintained by a belligerent party. It is even allowed that it would be most conformable to the true point of the case if the suit was in the name of the United States. What effect this would have I do not determine.

As to the Case of Palachi, reported by Bulstrode (3 Bulst. 28), I leave it to be judged of from an inspection of it, and the principles I have before mentioned as prevailing among the civilians in England at that day. My Lord Coke's statement of it in his 4th Institute does not confine it to criminal proceedings under British statutes (4 Inst. 154). He says that if the Spaniards sue for the property taken civiliter in the admiralty, a prohibition should be granted. And yet in Bulstrode it appears that the prohibition was refused. The civilians and common lawyers of that day, held some opinions not accounted sound at this time. My Lord Coke might have thought that the British laws and statutes alone should be attended to; and that the admiralty had no jurisdiction because the goods were on land, intra corpus comitatus; and the civilians thought otherwise, because the capture was not carried into the enemy's territory. But both these opinions are now exploded: for the admiralty has cognizance of matters on land if they are incidents to those at sea; and the doctrine of the civilians, as before supposed, is confessed not to be the law of this day. Modern improvements in jurisprudence have abolished many ancient opinions, and we must act upon the law as it now is: This case of Palachi has been insisted on by both sides, as favourable to their opposite opinions. This, it must be allowed, does not shew its precision and certainty. It is to be presumed (because it is mentioned by Lord Coke in delivering the opinion of the court, or stating the case as Bulstrode has re-

ported it) that Palachi, or Pelagus, being a Jew, and having drowned some Spanish prisoners, had some influence on this case. The Spanish ambassador was a formidable antagonist to the ambassador from Morocco. Gondemar governed King James, and royal influence was not unknown in the courts of justice. Political motives had their weight, and it was not as well settled then as it now is, that the Moors were to be treated on a footing with other nations. See 2 Wood. 425.

I do not think the worse of cases in general for their antiquity. But I do not follow them unless I am satisfied with the principles on which they stand. All the cases produced by the libellants, that I recollect, are a century old, and in this period it is singular that none can be produced expressly to their point. Those in Sir Leoline Jenkins do not shew any restitution by sentence of the court of admiralty. There appear to have been many proceedings in that court. One of them in Ireland evidently wrong; and another in which a prize was dismissed for trial in the proper jurisdiction, (Life of Sir L. Jenkins, 733, .727),—probably the court of the captor. But, by breaking bulk, she came under the notice of the court again, possibly for a breach of fiscal arrangements. In general, all that is to be found in Sir Leoline Jenkins, shews references from the king to him, and reports to the crown in consequence, to aid diplomatic enquiries. This seems to favour, rather than oppose, the opinions of the advocates for the captors in this case. There are a great variety of sentiments and opinions in these extra judicial reports of Sir L. Jenkins, of which I highly approve. Life of Sir L. Jenkins on this subject, passim. But I am not convinced that this court is the proper place to carry them into effect. If the court over which Sir Leoline presided could, in his opinion, have effected the objects of his correspondence with the king, we should have seen decrees and not letters on the subject from him to the crown. His opinion in page 751, is against the doctrine of carrying prizes infra praesidia.

As to the opinions in the "Exposition de Motifs," it is easy to say, as it is said by one of the advocates for the libellants, that they do not apply. It is as little difficult to say that they do. The cases on which the dispute originated, it is very true, are different from this. They were those of captures on the high seas, and the neutral ships brought into the ports of the captors, having the property of enemies on board. The commissioners appointed by the king of Prussia, composed a kind of court of review. But the principles laid down will apply to captures by one enemy from another. This may be seen by a reference to the books in which the exposition is to be found.

I do not extend these opinions farther, than to captures by one enemy from another. The treaty with France (Treaty of Alliance with France, § 17) insisted on by the captors, extends no farther than to such captures. This treaty has its due weight with me; but only in cases evidently comprehended in it. And it appears to me that this case is one of them, so far as judiciary, but not diplomatic examinations are concerned.

The idea that part of the sovereignty of this country is given to the judiciary for the purposes here required, is to me new. It should be well weighed before it is agreed to. I have not the same opinion in this point. I consider the judiciary as the expositors of the laws, and not partakers of the sovereignty for the objects of this suit. Their power is confined to matters of internal police; externally they have no power: they have none of the powers of peace or war. They have no right to command the forces of the country; and these are the means after negociation fails, by which sovereigns decide their disputes. The courts of England, though they decide freely on all matters of internal police, will not meddle with these rights of the sovereign. 2 Burrows, 765, 766. They will not even grant a habeas corpus in the case of a prisoner of war, because the decision on this question is in another place, being part of the rights of sovereignty. Although our judiciary is somewhat differently arranged, I see not, in this respect, that they should not be equally cautious.

The position, that in a neutral territory there is no war, and therefore there can be no legal captures is a good argument if used in the proper place. The reason is, that "he who acts against his enemy in the territory of a friend, acts also against the state who governs there." Lee, 122, 123. It is an offence to the neutral state. But still the question recurs—which is the proper department of the neutral state to inquire into and vindicate this offence? The weight of this argument, though it bears upon the point of outrage to the neutral, does not relieve us from the difficulties attending it. If this court would assume jurisdiction, and could ascertain our territorial limits and restore the property. the outrage would still remain for the nation to vindicate, if it should think proper. Therefore the court could afford but a partial remedy: and it is best to be settled where the whole can be accomplished.

The allegation that the libellants are not calling forth the powers of a prize court, but are seeking redress for a marine trespass, does not comport with the terms of the libel. But it is impossible to enquire into the question of trespass, without involving that of prize or no prize, and so "the original cause must all come over again." Doug. 612. The procedure here is in rem, and the object a specific restitution.

Damages may be superadded, but a proceeding for a marine trespass is different, as it is entirely a suit for damages, and not for the thing itself. Neither does this suit for a specific return of the property, appear to be included in the words of the judiciary act of

the United States, giving cognizance to this court of "all causes where an alien sues for a tort only, in violation of the laws of nations, or a treaty of the United States." Judiciary Act, § 9 [1 Stat. 76]. It cannot be called a suit for a tort only, when the property, as well as damages for the supposed trespass, are sought for.

A variety of observations were made by the advocates for the libellants, on the general principles of government, the rights of sovereignty and neutrality, and the consequences flowing from an invasion of those rights, just in themselves, but not, in my opinion, necessary for me to determine upon. They will fall very properly under the notice of our government, when the subject is before them. I should very willingly relieve them from part of the burthens thrown upon them by the unhappy contests among other nations; but my views of the powers of this court forbid my interference.

I do therefore decree, order and adjudge, that the brigantine Fanny, her tackle, apparel, and furniture, and the goods, wares and merchandize, mentioned in the libel, be discharged from arrest, and the libel be dismissed, the plea to the jurisdiction being relevant.