**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ALEXIS HOLYWEEK SAREI; PAUL E.
NERAU; THOMAS TAMAUSI; PHILLIP
MIRIORI; GREGORY KOPA;
METHODIUS NESIKO; ALOYSIUS
MOSES; RAPHEAL NINIKU; GABRIEL
TAREASI; LINUS TAKINU, LEO WUIS;
MICHAEL AKOPE; BENEDICT PISI;
THOMAS KOBUKO; JOHN TAMUASI;
NORMAN MOUVO; JOHN OSANI; BEN
KORUS; NAMIRA KAWONA; JOANNE
BOSCO; JOHN PIGOLO; MAGDALENE
PIGOLO, individually and on behalf
of themselves and all others
similarly situated,
         *Plaintiffs-Appellants,*

v.

RIO TINTO, PLC; RIO TINTO
LIMITED,
         *Defendants-Appellees.*

No. 02-56256

D.C. No.
CV-00-11695-
MMM

16439

ALEXIS HOLYWEEK SAREI; PAUL E.
NERAU; THOMAS TAMAUSI; PHILLIP
MIRIORI; GREGORY KOPA;
METHODIUS NESIKO; ALOYSIUS
MOSES; RAPHEAL NINIKU; GABRIEL
TAREASI; LINUS TAKINU, LEO WUIS;
MICHAEL AKOPE; BENEDICT PISI;
THOMAS KOBUKO; JOHN TAMUASI;
NORMAN MOUVO; JOHN OSANI; BEN
KORUS; NAMIRA KAWONA; JOANNE
BOSCO; JOHN PIGOLO; MAGDALENE
PIGOLO, individually and on behalf
of themselves and all others
similarly situated,
                    *Plaintiffs-Appellees,*

                    v.

RIO TINTO, PLC; RIO TINTO
LIMITED,
                    *Defendants-Appellants.*

No. 02-56390

D.C. No.
CV-00-11695-
MMM

OPINION

Appeal from the United States District Court
for the Central District of California
Margaret M. Morrow, District Judge, Presiding

Argued and Submitted
October 11, 2007—San Francisco, California

Filed December 16, 2008

Before: Mary M. Schroeder, Harry Pregerson,
Stephen Reinhardt, Andrew J. Kleinfeld, Barry G. Silverman,
M. Margaret McKeown, Marsha S. Berzon,
Johnnie B. Rawlinson, Consuelo M. Callahan, Carlos T. Bea,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge McKeown;
Concurrence by Judge Bea;
Dissent by Judge Ikuta;
Concurrence by Judge Kleinfeld;
Dissent by Judge Reinhardt

## COUNSEL

Steve W. Berman (argued), R. Brent Walton, and Nick Styant-Browne, Hagens Berman LLP, Seattle, Washington; Paul Luvera and Joel D. Cunningham, Luvera, Barnett, Brindley, Beninger & Cunningham, Seattle, Washington; and Paul Stocker, Mill Creek, Washington, for plaintiffs-appellants/cross-appellees.

James J. Brosnahan, Jack W. Londen (argued), and Peter J. Stern, Morrison & Foerster LLP, San Francisco, California, for defendants-appellees/cross-appellants.

Robert M. Loeb (argued), U.S. Department of Justice, Washington, DC, for *amicus curiae* the United States of America.

## OPINION

McKEOWN, Circuit Judge, joined by Judges SCHROEDER and SILVERMAN:

Current and former residents of Bougainville, Papua New Guinea ("PNG"), brought suit under the Alien Tort Statute ("ATS"), claiming that various war crimes, crimes against humanity, racial discrimination, and environmental torts arose out of Rio Tinto's mining operations on Bougainville. Plaintiffs allege Rio Tinto is liable not only for its actions that led to a civil war, but also vicariously for those of the PNG government, acting as Rio Tinto's agent or partner.

This case raises an important question of the role of exhaustion under the ATS, which bestows jurisdiction on United States courts for "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. Although the ATS does not itself require an alien to exhaust local remedies before invoking the jurisdiction of our courts, the Supreme Court signaled in *Sosa v. Alvarez-Machain* that a prudential or judicially-imposed exhaustion requirement for ATS claims "would certainly [be considered] in an appropriate case." 542 U.S. 692, 733 n.21 (2004). The application of *Sosa* to exhaustion under the ATS is a matter of first impression in this circuit, and we hold that this is "an appropriate case" to consider whether to invoke the exhaustion analysis.

Although we decline to impose an absolute requirement of exhaustion in ATS cases, we conclude that, as a threshold matter, certain ATS claims are appropriately considered for exhaustion under both domestic prudential standards and core principles of international law.[1] Where the "nexus" to the United States is weak, courts should carefully consider the question of exhaustion, particularly— but not exclusively— with respect to claims that do not involve matters of "universal concern." Matters of "universal concern" are offenses "for which a state has jurisdiction to punish without regard to territoriality or the nationality of the offenders." *Kadic v. Karadzic*, 70 F.3d 232, 240 (2d Cir. 1995) (citing *Restatement (Third) Foreign Relations Law of the United States* § 404 (1987) ("*Restatement (Third)*")). Because the district court did not analyze exhaustion as a discretionary matter, we remand for the district court to address this issue in the first instance, using the framework outlined below.

## BACKGROUND[2]

Bougainville is an island in the South Pacific located just off the main island of PNG. Rich in natural resources, including copper and gold, the island was targeted as a prime min-

---

[1]*See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 127 S. Ct. 1184, 1191 (2007) (holding "a federal court has leeway to choose among threshold grounds for denying audience to a case on the merits" (internal quotation marks omitted)). Although Judge Ikuta "see[s] no basis for holding that the district court erred by failing to consider exhaustion before other threshold issues," Ikuta Dissent at 16468, exhaustion stands on different footing than a decision, for example, on political question or act of state grounds. As a prudential matter, in this case there is a certain logic to considering exhaustion before considering threshold grounds that may "deny[ ] audience to a case on the merits." *Sinochem Int'l Co.*, 127 S. Ct. at 1191.

[2]This background is drawn from the complaint; at this stage, we accept plaintiffs' allegations as true. *Alperin v. Vatican Bank*, 410 F.3d 532, 541 (9th Cir. 2005). A more detailed articulation of the facts is found in the district court's thoughtful and extensive opinion. *See Sarei v. Rio Tinto*, 221 F. Supp. 2d 1116, 1121-30 (C.D. Cal. 2002).

ing site by defendants Rio Tinto, plc, a British and Welsh corporation, and Rio Tinto Limited, an Australian corporation (collectively "Rio Tinto"). Rio Tinto is part of an international mining group that operates over sixty mines and processing plants in forty countries, including the United States. To operate a mine on Bougainville, Rio Tinto required and received the assistance of the PNG government. According to the complaint, beginning in the 1960s, Rio Tinto displaced villages, razed massive tracts of rain forest, intensely polluted the land, rivers, and air (with extensive collateral consequences including fatal and chronic illness, death of wildlife and vegetation, and failure of farm land), and systematically discriminated against its Bougainvillian workers, who lived in slave-like conditions.

In November 1988, some Bougainville residents revolted; they sabotaged the mine and forced its closure. After Rio Tinto demanded that the PNG government quash the uprising, the government complied and sent in troops. PNG forces used helicopters and vehicles supplied by Rio Tinto. On February 14, 1990, the country descended into a civil war after government troops slaughtered many Bougainvillians in what has come to be known as the "St. Valentine's Day Massacre."

Unable to resume mining, Rio Tinto threatened to abandon its operations and halt all future investment in PNG unless the government took military action to secure the mine. In April 1990, the PNG government imposed a military blockade on the island that lasted almost a decade. The blockade prevented medicine, clothing, and other necessities from reaching the residents. Under further pressure from Rio Tinto, according to the complaint, the government engaged in aerial bombardment of civilian targets, wanton killing and acts of cruelty, village burning, rape, and pillage. As a result, an estimated fifteen thousand Bougainvillians, including many children, died. Of the survivors, tens of thousands are displaced and many suffer health problems. In March 2002, the PNG Parliament formalized a peace accord that ended the civil war.

In November 2000, nearly a year and a half before the civil war formally ended, plaintiffs filed this class action, raising numerous claims under the ATS: (1) crimes against humanity resulting from the blockade; (2) war crimes for murder and torture; (3) violation of the rights to life, health, and security of the person resulting from the environmental damage; (4) racial discrimination in destroying villages and the environment, and in working conditions; (5) cruel, inhuman, and degrading treatment resulting from the blockade, environmental harm, and displacement; (6) violation of international environmental rights resulting from building and operating the mine; and (7) a consistent pattern of gross violations of human rights resulting from destruction of the environment, racial discrimination, and PNG military activities. Plaintiffs also raised various non-ATS claims ranging from negligence to public nuisance.

The district court determined plaintiffs stated various cognizable ATS claims: war crimes, crimes against humanity, racial discrimination, and violation of the United Nations Convention on the Law of the Sea ("UNCLOS"). *Sarei v. Rio Tinto, PLC*, 221 F. Supp. 2d 1116, 1149, 1151, 1155, 1162 (C.D. Cal. 2002). Nonetheless, the district court dismissed the entire complaint as presenting nonjusticiable political questions. *Id.* at 1198-99. The court alternatively dismissed the racial discrimination and environmental tort claims under the act of state doctrine, *id.* at 1193, as well as the doctrine of international comity, *id.* at 1207. Finally, it also held that the ATS did not *require* exhaustion of local remedies, but did not address exhaustion as a prudential or discretionary issue. *Id.* at 1132-39.

After the plaintiffs filed their notice of appeal, the Supreme Court decided the landmark case of *Sosa*, which clarified that the ATS is a jurisdictional statute and held that "federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the

historical paradigms familiar when § 1350 was enacted." 542 U.S. at 732. As noted, the Court also adverted for the first time to exhaustion under the ATS.

On appeal, a three-judge panel affirmed in part, reversed in part, vacated in part, and remanded, with one judge dissenting. *Sarei*, 487 F.3d at 1223-24. The majority held that the district court had subject matter jurisdiction under the ATS because plaintiffs alleged nonfrivolous *jus cogens* violations for racial discrimination, war crimes, and crimes against humanity, including any claims that rested on vicarious liability. *Id.* at 1202. The panel concluded that the district court erred when it dismissed plaintiffs' claims as political questions. *Id.* at 1208. The panel further held that the district court erred by dismissing the racial discrimination claim under the act of state doctrine, and that the district court should reconsider its dismissal of the UNCLOS claim on this ground. *Id.* at 1209-10. The panel remanded so the district court could also reconsider its dismissal of the racial discrimination and UNCLOS claims under the doctrine of international comity. *Id.* at 1213.

Finally, as to the issue that is the sole focus of this en banc opinion, the panel majority held that the ATS does not require exhaustion of local remedies. *Id.* at 1223. The court reasoned that (1) the language of the statute does not require exhaustion; (2) the legislative history contains no reference to exhaustion or even to the ATS itself; (3) Congress's inclusion of an explicit exhaustion requirement in the Torture Victims Protection Act of 1991 suggests that Congress did not intend to require exhaustion of ATS claims; and (4) policy concerns did not justify creating an exhaustion requirement as a matter of judicial discretion. *Id.* at 1215, 1218, 1223.

In dissent, Judge Bybee addressed only the exhaustion issue. He concluded that international law requires exhaustion of local remedies and that in the exercise of judicial discre-

tion, our federal courts should require exhaustion. *Id.* at 1237 (Bybee, J., dissenting).

Because this case presents a number of issues of exceptional importance, we ordered that it be heard en banc pursuant to Circuit Rule 35-3. *Sarei v. Rio Tinto, PLC*, 499 F.3d 923 (9th Cir. 2007).

## ANALYSIS

## I. EXHAUSTION IN ATS CASES

As the Supreme Court directed in *Sosa*, exhaustion of local remedies should "certainly" be considered in the "appropriate case" for claims brought under the ATS. 542 U.S. at 733 n.21. This is an appropriate case for such consideration under both domestic prudential standards and core principles of international law.

**[1]** Here, the district court declined to consider imposing exhaustion. The district court held that the ATS created a domestic cause of action—a view shared by many courts before *Sosa*—and that exhaustion of local remedies was not required to state a claim, because the statute itself did not explicitly incorporate exhaustion. *Sarei*, 221 F. Supp. 2d at 1138-39. The Supreme Court has since clarified that the ATS is a jurisdictional statute that does not create a cause of action and has noted the availability of exhaustion in an "appropriate case."

The parties, the district court, and the panel majority and dissent all analyzed the exhaustion question by initially asking whether the ATS *requires* exhaustion. The inquiry as to whether exhaustion is required by the statute leads with the wrong foot post-*Sosa*.

**[2]** Our starting point is the Court's explicit reference to exhaustion in *Sosa*:

This requirement of clear definition is not meant to be the only principle limiting the availability of relief in the federal courts for violations of customary international law, though it disposes of this action. For example, the European Commission argues as *amicus curiae* that basic principles of international law require that before asserting the claim in a foreign forum, the claimant must have exhausted any remedies available in the domestic legal system, and perhaps in other forums such as international claims tribunals. We would certainly consider this requirement in an appropriate case.

542 U.S. at 733 n.21 (internal citations omitted). *See also id.* at 760 (Breyer, J., concurring in part and in the judgment) ("The Court also suggests that principles of exhaustion *might* apply . . . ." (emphasis added)). Thus, the Court appears to consider exhaustion a prudential "principle" *among others* that courts should consider beyond the initial task of determining whether the alleged violations of the ATS satisfy the "requirement of clear definition." *Id.* at 733 n.21.[3]

Approaching exhaustion as a prudential principle renders unnecessary our wading into the debate whether the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350, which was adopted in 1991 and explicitly incorporates an exhaustion requirement, offers insight into Congress's intent to impose

---

[3]Judge Bea posits that the Court was contemplating a mandatory exhaustion requirement. Bea Concurrence at 16463-64. Judge Reinhardt argues the Court did not signal a thing. Reinhardt Dissent at 16474. The reality is that the Court neither mandated exhaustion nor said the principle should be ignored. Given the debate over the language in *Sosa* and the fact that neither the Court nor Congress has imposed a mandatory exhaustion requirement under the ATS, prudential exhaustion best reflects a cautious and practical resolution. Approaching exhaustion as a prudential principle countenances—and attempts to reconcile—many of the competing concerns expressed in both Judge Bea's concurrence and Judge Reinhardt's dissent.

the same requirement in the context of the ATS, which was enacted in 1789. *See Sarei*, 487 F.3d at 1215-19; *id.* at 1227-30 (Bybee, J., dissenting).[4] Not only does this TVPA comparison not particularly forward the discussion, *Sosa*'s pronouncement relieves us of the need to engage in the comparison in the first place.

**[3]** Prudential exhaustion also avoids another jurisprudential debate remaining in the wake of *Sosa*: whether exhaustion is a substantive norm of international law, to which the "requirement of clear definition" applies; or if it is nonsubstantive,[5] what source of law—federal common law or international law—illuminates its content. *See Sarei*, 487 F.3d at 1221. Though *Sosa* is vague on this broad question of methodology, it unambiguously states that the "requirement of clear definition" of an international norm is distinct from the consideration of *other factors* that might also serve to limit the relief available through the ATS. 542 U.S. at 733 n.21. In the absence of any further comment by the Supreme Court, it is fair to assume (at least for the purposes of exhaustion) that we may freely draw from both federal common law and international law without violating the spirit of *Sosa*'s instructions or committing ourselves to a particular method regarding other

[4]Judge Bybee's dissent to the panel opinion is thorough and scholarly. Although drawing on his reasoning and analysis, we do not subscribe to his approach *in toto* because it would impose exhaustion as an absolute requirement in ATS cases.

[5]According to several commentators, this division is an issue "on which much intellectual energy has been wasted," so we need not add to the mix. *See* Robert Rosenstock & Margo Kaplan, *Current Development: The Fifty-Third Session of the International Law Commission*, 96 Am. J. Int'l L. 412, 417 (2002) (discussing exhaustion in the context of diplomatic protection, and noting Special Rapporteur's analysis, which distinguishes cases where the failure to provide a local remedy is part of the underlying wrong, making the rule substantive, from cases where a subsequent act, such as the denial of justice, creates a wrong that incurs the right of diplomatic protection, making the rule procedural); *see also Sarei*, 487 F.3d at 1234-36 (Bybee, J. dissenting).

nonsubstantive aspects of ATS jurisprudence left open after *Sosa*.

## II. PRUDENTIAL EXHAUSTION

Judicially-imposed or prudential exhaustion is not a prerequisite to the exercise of jurisdiction, but rather is "one among related doctrines—including abstention, finality, and ripeness—that govern the timing of federal-court decisionmaking." *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992), *superceded by statute as stated in Booth v. Churner*, 532 U.S. 731, 732 (2001). Although some statutory exhaustion requirements are jurisdictional in nature,[6] prudential exhaustion originated in habeas corpus cases to serve a gatekeeping function preventing "unnecessary conflict between [federal and state] courts equally bound to guard and protect rights secured by the [C]onstitution." *Ex parte Royall*, 117 U.S. 241, 251 (1886); *see also Hemphill v. Moseley*, 443 F.2d 322, 323 (10th Cir. 1971) (applying exhaustion in habeas case originating in military court system). Exhaustion in this context has been described as "grounded in principles of comity." *Castille v. Peoples*, 489 U.S. 346, 349 (1989).

The principle of comity also underlies the requirement of tribal court exhaustion. *See Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 14-15 (1987) (quoting *United States v. Mazurie*, 419 U.S. 544, 557 (1975)) ("[Exhaustion] reflects the fact that Indian tribes retain 'attributes of sovereignty over both their members and their territory.' "). Invoking exhaustion out of

---

[6]*See, e.g., Weinberger v. Salfi*, 422 U.S. 749, 764-67 (1975) (holding 42 U.S.C. § 405(h) of the Social Security Act contains a jurisdictional exhaustion requirement); *Platte River Whooping Crane Critical Habitat Maint. Trust v. FERC*, 876 F.2d 109, 112-13 (D.C. Cir. 1989) (interpreting Federal Power Act statute, 16 U.S.C. § 825l(b), to provide a jurisdictional exhaustion requirement); *Lindsey v. U.S.*, 448 F. Supp. 2d 37, 51 (D.D.C. 2006) (interpreting provision of the Internal Revenue Code, 26 U.S.C. § 7422(a), as imposing a jurisdictional exhaustion requirement).

respect for another sovereign, as we do in the case of tribal courts, resonates most forcefully in the international context.

## III.   THE EXHAUSTION OF LOCAL REMEDIES RULE IN INTERNATIONAL LAW

"Under international law, ordinarily a state is not required to consider a claim by another state for an injury to its national until that person has exhausted domestic remedies, unless such remedies are clearly sham or inadequate, or their application is unreasonably prolonged." *Restatement (Third)* § 713 cmt. f; *see also id.* § 703 cmt. d; *Interhandel Case (Switz. v. U.S.)*, 1959 I.C.J. 6, 26 (Mar. 29) ("The rule that local remedies must be exhausted before international proceedings may be instituted is a well-established rule of customary international law.").[7] The rule is generally applied when one state pursues the cause of one of its nationals, whose rights another state has disregarded in violation of international law: "Before resort may be had to an international court in such a situation, it has been considered necessary that the State where the violation occurred should have an opportunity to redress it by its own means, within the framework of its own domestic legal system." *Interhandel*, 1959 I.C.J. at 27; *see also Restatement (Third)* §§ 703 cmt. d, 713 cmt. f.

Because sovereigns are co-equal in the international legal

---

[7]The United States accepted compulsory jurisdiction of the International Court of Justice ("ICJ"), a judicial organ of the United Nations, until 1986, when, in the wake of the ICJ's exercise of jurisdiction over a suit brought against the United States by Nicaragua, the United States withdrew its consent to compulsory jurisdiction. *See* Letter from George P. Schultz, Secretary of State of the United States of America, to Javier Perez de Cuellar, Secretary-General of the United Nations (Oct. 7, 1985), reprinted in 24 I.L.M. 1742 (1985). Now, the United States accepts jurisdiction of the ICJ on a case-by-case basis or in particular treaties. *See* Statute of the International Court of Justice, art. 36, para. 1, June 26, 1945, 156 U.N.T.S. 77.

arena, one sovereign can exercise power over another only through consent. *See United States v. Diekelman*, 92 U.S. 520, 524 (1875) ("[A sovereign's] own dignity, as well as the dignity of the nation he represents, prevents his appearance to answer a suit against him in the courts of another sovereignty, except in performance of his obligations, by treaty or otherwise, voluntarily assumed."). Even in the face of sovereigns' consent to the jurisdiction of international tribunals, principles of comity have dictated that exhaustion remains a requirement. Thus, for example, the treaties establishing international human rights courts have codified the exhaustion principle in their statutes as a general requirement for the admissibility of complaints. *See, e.g.*, *The Matter of Viviana Gallardo et al*, Series A., No. G 101/81, Inter-Am. C.H.R., Nov. 13, 1981, ¶ 26 ("[Exhaustion] is designed for the benefit of the State," because it "excuse[s] the State from having to respond to charges before an international body for acts imputed to it before it has had the opportunity to remedy them by internal means.").[8]

Nonetheless, codification of the exhaustion requirement in international treaties is not in absolute terms. International law—both private and public—has long anticipated that local remedies might not always be adequate and that justice may be denied if claimants are forced to exhaust before being heard in an international forum. *Restatement (Third)* §§ 703 cmt. d, 713, cmt. f. A core element of the exhaustion rule is its futility, or denial of justice exception, which excuses

---

[8]*See also* The European Convention for the Protection of Human Rights and Fundamental Freedoms, art. 35, Nov. 4, 1950, 213 U.N.T.S. 222 ("The Court may only deal with the matter after all domestic remedies have been exhausted, according to the generally recognised rules of international law."); The American Convention on Human Rights, art. 46, Nov. 22, 1969, 1144 U.N.T.S. 143 ("Admission by the Commission of a petition or communication . . . shall be subject to the following requirements: that the remedies under domestic law have been pursued and exhausted in accordance with generally recognized principles of international law.").

exhaustion of local remedies where they are unavailable or inadequate. *Id.*

United States courts have also recognized the futility exception with regard to human rights claims, *see, e.g.*, *Hilao v. Estate of Marcos*, 103 F.3d 767, 778 n.5 (9th Cir. 1996) (discussing Senate Report for the TVPA, which places the burden on the plaintiff to show that the local remedies were "ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile"), as well as in more routine matters, such as tax, *see, e.g.*, *Newcomb v. Comm'r*, 23 T.C. 954, 960-61 (1955) ("We do not think that if respondent had attempted to pursue any remedies in the Canadian courts he would have met with any success. The courts do not require one to do a useless act.").

## IV.  CONSIDERATIONS ANIMATING EXHAUSTION

Though it is self-evident, it is worth remembering that in ATS adjudication, the United States courts are *not* international tribunals. With this in mind, the appropriateness of applying prudential exhaustion to some ATS cases only gains force; if exhaustion is considered essential to the smooth operation of international tribunals whose jurisdiction is established only through explicit consent from other sovereigns, then it is all the more significant in the absence of such explicit consent to jurisdiction.

Certain ATS cases, like this one, present United States courts with scenarios that simultaneously appeal to two divergent impulses that have traditionally played out in our country's international affairs and have been imported into our legal system. The first impulse is to safeguard and respect the principle of comity. *See Societe Nationale Industrielle Aerospatiale v. United States Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 544 n.27 (1987) ("Comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sover-

eign states."). The second is the American role in establishing collective security arrangements that support international institutions, including international tribunals. *See, e.g.*, *Charter of the International Military Tribunal*, art. 1, Aug. 8, 1945 (The United States, along with the Allied powers, collectively establishing the Tribunal "for the just and prompt trial and punishment of major war criminals of the European Axis."). Both impulses draw from the recognition that we need a complement to our domestic system, because we are but one member in a community of nations. In that community, international law plays a substantive role.

But international law also imposes limits. The lack of a significant United States "nexus" to the allegations here stimulates the comity impulse. These claims involve a foreign corporation's complicity in acts on foreign soil that affected aliens (though at least one of them—Sarei—has enjoyed the status of a lawful permanent resident of this country for some time now). This situation thus lacks the traditional bases for exercising our sovereign jurisdiction to prescribe laws, namely nationality, territory, and effects within the United States. *See Restatement (Third)* § 403(2) at cmt. d. (stating jurisdiction is appropriately exercised with respect to activity outside the state that has or intends to have substantial effect within the state's territory). The lack of a significant U.S. "nexus" is an important consideration in evaluating whether plaintiffs should be required to exhaust their local remedies in accordance with the principle of international comity.

The nature of certain allegations and the gravity of the potential violations of international law also trigger the second impulse: our historical commitment to upholding customary international law. Some of the claims—torture, crimes against humanity, and war crimes—may implicate matters of "universal concern," generally described as offenses "for which a state has jurisdiction to punish without regard to territoriality or the nationality of the offenders." *Kadic*, 70 F.3d at 240 (citing *Restatement (Third)* § 404); *see also Wiwa v.*

*Royal Dutch Petroleum Co.*, 226 F.3d 88, 108 (2d Cir. 2000) (holding "the policy expressed in the TVPA favoring adjudication of claims of violations of international prohibitions on torture" weighed against dismissing the action on *forum non conveniens* grounds).

Nonetheless, simply because universal jurisdiction *might* be available, does not mean that we should exercise it. Indeed, the basis for exercising universal *civil* jurisdiction, such as under the ATS, is not as well-settled as the basis for universal *criminal* jurisdiction. *See Sosa*, 542 U.S. at 761-63 (Breyer, J., concurring in part and in the judgment) (noting the lack of "similar procedural consensus supporting the exercise of jurisdiction" in ATS cases as obtained to piracy in the 18th century or the contemporary exercise of universal *criminal* jurisdiction over matters of universal concern).[9] Even the few courts that have exercised some form of universal *criminal* jurisdiction over matters of "universal concern" have done so cautiously. *See* Cedric Ryngaert, *Applying the Rome Statute's Complementarity Principle: Drawing Lessons from the Prosecution of Core Crimes by States Acting under the Universality Principle*, 19 Crim. L.F. 153, 155-73 (2006) (surveying decisions by Austria, Belgium, France, Germany, and Spain).

This caution counsels that in ATS cases where the United States "nexus" is weak, courts should carefully consider the question of exhaustion, particularly—but not exclusively—with respect to claims that do not involve matters of "universal concern." With these underlying principles in place, we suggest a framework for evaluating exhaustion.

## V. A FRAMEWORK FOR EVALUATING EXHAUSTION

[4] To begin, exhaustion under the ATS should be

---

[9]*See Sosa*, 542 U.S. at 762-63 (Breyer, J., concurring in part and in the judgment) (citing *Brief Amicus Curiae the European Commission in Support of Neither Party*, filed in *Sosa*, 2004 WL 177036, at *17-22).

approached consistently with exhaustion principles in other domestic contexts. The defendant bears the burden to plead and justify an exhaustion requirement, including the availability of local remedies. *See Jones v. Bock*, 127 S. Ct. 910, 919 (2007) ("[T]he usual practice under the Federal Rules is to regard exhaustion as an affirmative defense."). Although the plaintiff may rebut this showing with a demonstration of the futility of exhaustion, the ultimate burden remains with the defendant. *See, e.g.*, *Honig v. Doe*, 484 U.S. 305, 325-29 (1988) (allowing plaintiffs to by-pass administrative process where exhaustion would be futile or inadequate).

This same burden-shifting analysis is invoked under the TVPA:

> [O]nce the defendant makes a showing of remedies abroad which have not been exhausted, the burden shifts to the plaintiff to rebut by showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile. The ultimate burden of proof and persuasion on the issue of exhaustion of remedies, however, lies with the defendant.

S.Rep. No. 102-249, at 9 (1991); *accord Hilao*, 103 F.3d at 778 n.5 (quoting TVPA Senate Report). While the TVPA is not dispositive of the question of whether exhaustion is *required* by the ATS, the TVPA nonetheless provides a useful, congressionally-crafted template to guide our adoption of an exhaustion principle for the ATS. *See Enahoro v. Abubakar*, 408 F.3d 877, 890 (7th Cir. 2005) (Cudahy, J., dissenting) ("[W]hile not directly applicable to the ATS, the TVPA scheme is surely persuasive.").

**[5]** As a preliminary matter, to "exhaust," it is not sufficient that a plaintiff merely initiate a suit, but rather, the plaintiff must obtain a final decision of the highest court in the hierarchy of courts in the legal system at issue, or show that the

state of the law or availability of remedies would make further appeal futile. Chitharanjan Felix Amerasinghe, *Local Remedies in International Law* 181 (2d ed. 1990); *see also Interhandel*, 1959 I.C.J. at 26-27 (analyzing, in determining whether remedies had been exhausted, the stage of litigation plaintiff had reached in United States courts).

**[6]** Another basic element is that the remedy must be available, effective, and not futile. *Restatement (Third)* §§ 703 cmt. d, 713 cmt. f; *see generally* Amerasinghe, *supra*, at 166-71, 187-207. To measure effectiveness, a court must look at the circumstances surrounding the access to a remedy and the ultimate utility of the remedy to the petitioner. *Restatement (Third)* §§ 703 cmt. d, 713 cmt. f. In addition, "[w]hen a person has obtained a favorable decision in a domestic court, but that decision has not been complied with, no further remedies need be exhausted." *Id.* § 713 cmt. f. A judgment that cannot be enforced is an incomplete, and thus ineffective, remedy. The adequacy determination will also necessarily include an assessment of any delay in the delivery of a decision. Amerasinghe, *supra*, at 203-06.

## Conclusion

**[7]** We remand to the district court for the limited purpose to determine in the first instance whether to impose an exhaustion requirement on plaintiffs.[10]

Remanded for proceedings consistent with this opinion.

---

[10]Six judges concur in a limited remand for the district court to consider exhaustion. Because prudential exhaustion is a narrower ground of exhaustion than statutory exhaustion—a statutory exhaustion analysis must be applied in every case but a prudential exhaustion analysis only in some cases—the plurality's prudential exhaustion requirement controls. *See Marks v. United States*, 430 U.S. 188, 193 (1977).

BEA, Circuit Judge, concurring, joined by Judge
CALLAHAN:

The plurality opinion holds judicial prudence requires the
district court to consider whether Sarei exhausted his local
remedies before filing his action in the United States. I concur
in the plurality's conclusion that the district court erred by
failing to conduct an exhaustion analysis,[1] and I agree a lim-
ited remand is the preferable solution. However, I think the
Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, and not mere
judicial prudence, requires the district court to consider
exhaustion, and I write separately to explain why.

I read *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), dif-
ferently than does the plurality. In *Sosa*, the United States
Supreme Court explained the ATS is a jurisdictional statute
that does not create any substantive law; it simply provides a
forum for hearing existing causes of action that arise under
the law of nations, if such causes of action exist. *See id.* at 712
("[W]e think that at the time of enactment the jurisdiction
[conferred by the ATS] enabled federal courts to hear claims
in a very limited category defined by the law of nations and
recognized at common law."). Thus, the ATS does not create

---

[1]As explained in this concurrence, I mean "exhaustion analysis" to
include the two-step process by which the district court considers (1)
whether Sarei had local remedies and has exhausted them, and, if not, (2)
whether the requirement Sarei must exhaust his local remedies is excused
because local remedies are ineffective, unobtainable, unduly prolonged,
inadequate, or otherwise futile to pursue. I understand the plurality's "pru-
dential" exhaustion analysis to require a prior step in which the district
court must, in its discretion, choose whether even to reach the two-step
analysis described above, depending on considerations such as whether
Sarei's claims have a close nexus to the United States, affect principles
favoring international comity and advancement of international institu-
tions, and implicate notions of customary international law. In contrast to
the plurality, I would hold the ATS *requires* the district court to engage
in the two-step exhaustion analysis, rather than allow the district court to
pick and choose whether claims of torts committed in foreign lands merit
such an analysis.

any cause of action of its own, but merely incorporates causes of action that exist in "the present-day law of nations" and fit into "18th-century paradigms," *Sosa*, 542 U.S. at 725, as if they were expressly written into the statute.[2]

The plurality's reasoning seems to be that although the ATS incorporates causes of action recognized by the law of nations, it does not incorporate required limitations on those causes of action also recognized by the law of nations. This doesn't seem logical to me. Rather, it makes more sense to interpret the ATS as incorporating the whole of the law of nations: the rights it grants *and* the limitations it places on those rights. *See* David H. Moore, *An Emerging Uniformity for International Law*, 75 Geo. Wash. L. Rev. 1, 45 (2006) ("If a claim is subject to an exhaustion requirement in international law, it should not be incorporated without that limitation.").

As Judge Bybee carefully demonstrates in his dissent from the merits panel's majority opinion, "[e]xhaustion is a well-established principle of international law, recognized by courts and scholars both here and abroad. It is so well entrenched that one scholar has written that 'the celebrated rule of local remedies is accepted as a customary rule of international law [and] needs no proof today, as its basic existence and validity has not been questioned' . . . ." *Sarei v. Rio Tinto, PLC*, 487 F.3d 1193, 1231 (9th Cir. 2007) (Bybee, J., dissenting) (citation omitted).[3]

---

[2]As I read *Sosa*, a court may not incorporate causes of action under the ATS in a form substantively different from that recognized by the law of nations. Thus, for instance, a court may not incorporate a torture cause of action to include or exclude elements other than those recognized by customary international law.

[3]Judge Bybee's dissent from the merits panel majority's opinion details the evidence that exhaustion has long been a part of the law of nations as recognized in the United States and elsewhere, and I do not seek to replicate his fine work here. *Id.* at 1231-37. Judge Bybee's dissent, which I

Judge Bybee's dissent concludes that exhaustion's " 'wide and unchallenged acceptance is evidence of [the] utility and of the soundness of [exhaustion's] policy foundation' " in the law of nations. *Id.* Since Judge Bybee filed his dissent, a number of other scholars[4] have chimed in to recognize the mandatory nature of an exhaustion analysis under customary international law. *See, e.g.*, Rosica (Rose) Popova, Sarei v. Rio Tinto *and the Exhaustion of Local Remedies Rule in the Context of the Alien Tort Claims Act: Short-Term Justice, But*

---

heartily recommend the reader review, concludes "international law requires exhaustion of local remedies . . . ." *Id.* at 1224-45. His dissent explains that from the Jay Treaty of 1794, which normalized trade relations between an independent United States and Britain for the first time, to the treaty creating the International Court of Justice and the founding treaties of the European Union, exhaustion has been a commonly accepted component of the law of nations for the past 200 years. *Id.* at 1231-32. He cites dozens of scholars who have found exhaustion such an ineluctable piece of the international legal norm they presume its necessity. *Id.* at 1234-37. He notes that almost all modern treaties require local exhaustion, including the American Convention on Human Rights and the European Convention for the Protection of Human Rights and Fundamental Freedoms. *Id.* at 1232-34. In other words, Judge Bybee discovers that exhaustion "is so well entrenched that . . . '[it] is accepted as a customary rule of international law and needs no proof today, as its basic existence and validity has not been questioned.' " *Id.* at 1231 (citation omitted).

However, there is one aspect of Judge Bybee's dissent with which I disagree: once Judge Bybee decided the ATS required exhaustion as a statutory matter, based on the ATS's incorporation of customary international law, there was no need to speculate as to whether there was an additional, prudential basis for exhaustion. Indeed, I do not think the elements that go into a prudential consideration, such as "nexus" or international comity, *see supra* n.1, should be left to individual and potentially discordant trial court determinations. The facts underpinning these prudential considerations are generally undisputed; the determinations primarily involve judicial policy with regard to international relations. Rather, as I hope to explain in this concurrence, under the ATS the judicial policy of the courts of the United States is clear: because it is a well-recognized requirement in the law of nations, a two-step exhaustion analysis is mandatory.

[4]Judge Bybee is a Senior Fellow in Constitutional Law at the William S. Boyd School of Law, University of Nevada, Las Vegas.

*At What Cost?*, 28 Hamline J. Pub. L. & Pol'y 517, 519 (2007) (explaining the "exhaustion requirement is a universal and binding norm which should not be severed from the traditional law of nations as applied in American courts through the [ATS]"); Emeka Duruigbo, *Exhaustion of Local Remedies in Alien Tort Litigation: Implications for International Human Rights Protection*, 29 Fordham Int'l L.J. 1245, 1247-48 (2006) ("The exhaustion of local remedies rule is a well-known principle of customary international law . . . . [that] has maintained a presence in the international legal system for centuries. 'Even for a rule of customary international law, the local remedies rule has particularly deep roots.' "); Richard Frimpong Oppong, *Observing the Legal System of the Community: The Relationship Between Community and National Legal Systems Under the African Economic Community Treaty*, 15 Tul. J. Int'l & Comp. L. 41, 76 (2006) (referring to exhaustion of local remedies as a "traditional" requirement of international law); Prof. Dr. Ernst-Ulrich Petermann, *Justice as Conflict Resolution: Proliferation, Fragmentation, and Decentralization of Dispute Settlement in International Trade*, 27 U. Pa. J. Int'l Econ. L. 273, 304 (2006) (referring to the "traditional international law rules on prior exhaustion of local remedies"). It seems to me that given the ATS's incorporation of the law of nations, this wide recognition of the customary exhaustion requirement critically undermines the plurality's conclusion that "[t]he inquiry as to whether exhaustion is required by the [ATS] statute leads with the wrong foot . . . ." Plurality Op. at 16449. Quite the contrary.

Indeed, as the *Sosa* Court observed, there are boundaries other than a "clear definition" of an "international law norm" that may "limit[ ] the availability of relief in the federal courts [under the ATS] for violations of customary international law . . . ." *Id.* at 732-33 & n.21. The Court mentioned two expressly:

(1) "[T]he European Commission argues . . . that basic principles of international law *require* [exhaustion of local

remedies]. We would certainly consider this *requirement* in an appropriate case." *Id.* at 733 n.21 (emphasis added).

(2)   "Another possible limitation . . . is a policy of *case-specific* deference to the political branches." *Id.* (emphasis added).

A careful reading of this passage reveals the key words to be "consider this requirement in an appropriate case." The *Sosa* Court did not *reject* the European Commission's suggestion that exhaustion is one of the "basic principles of international law"; exhaustion simply had not been raised in that case.[5] But if exhaustion *is* raised, and so the case *is* appropriate, it would seem *Sosa* indicated the Court would consider exhaustion as a *requirement.* "Deference to the political branches," on the other hand, is not required, but only "*possible*," and then only on a case-specific—i.e., prudential—basis.

This distinction matters: because a district court has discretion to waive a prudentially required exhaustion requirement, but not a statutorily required one, *see, e.g.*, *Acevedo-Carranza v. Ashcroft*, 371 F.3d 539, 541 (9th Cir. 2004), the plurality's rule would permit a single district court judge to interject the judiciary into ongoing international disputes and crises of foreign affairs. *See Sarei*, 487 F.3d at 1242-45 (Bybee, J., dissenting). This is critical in cases such as this one, where the facts may be so appalling as to tug mightily on the heart but the result of judicial intervention could be counterproductive. Indeed, respect for other nations and a desire to encourage diplomatic, rather than judicial, solutions is precisely why the law of nations imposes an exhaustion requirement, and is why "statutes should be read in accord with the customary deference to the application of foreign countries' laws within their own territories." *F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 176 (2004) (Scalia, J., concurring).

---

[5]That is, no one claimed Dr. Alvarez-Machain first had to seek compensation against the agents who kidnapped him in Mexico *in Mexico*.

It is important to note that the exhaustion doctrine, which I think is incorporated into the ATS, itself includes exceptions to the requirement that a plaintiff exhaust his local remedies —for instance, where prosecuting an action locally would be futile or ineffective. Logically, these exceptions must also be incorporated into the ATS. *See* Laura Niada, *Hunger and International Law: The Far-Reaching Scope of the Human Right to Food*, 22 Conn. J. Int'l L. 131, 194 (2006) ("[T]he principle of exhaustion of domestic remedies demands that these remedies have primacy in the enforcement of international law. When a State, however, is not willing or able to provide ordinary access to justice, the international arena may be called in support."). In other words, as *part* of the law of nations's exhaustion requirement, the futility excuse is *also* incorporated into the ATS's statutory exhaustion requirement. Thus, a statutorily required two-step exhaustion analysis would permit Sarei to prosecute his ATS claims without exhausting his local remedies in Papua New Guinea if he can prove that local remedies there are ineffective, unobtainable, unduly prolonged, inadequate, or otherwise futile to pursue.

I wish to make clear that a statutory exhaustion requirement does not mean a plaintiff must prove in every case that he *has* exhausted his local remedies. Rather, it means a district court must conduct a two-step exhaustion analysis, in the process considering whether first, local remedies exist, and second, whether local exhaustion would be futile,[6] unduly prolonged,

---

[6]Judge Reinhardt's dissent urges we accept that futility of exhaustion was conclusively established by the declarations of Thomas Tapuri and Frances Bom, filed nunc pro tunc as exhibits to Sarei's opposition to Rio Tinto's motion to dismiss, which averred fear of physical harm if they brought this action locally in Papua New Guinea. Judge Reinhardt's suggestion is incorrect. First, while a fear of physical harm may be evidence of futility, determination whether such fear is sufficiently credible to render exhaustion futile—which is a different analysis than that done by the district court for futility under the doctrine of *forum non conveniens*— should be made in the first instance by the district court when there is a dispute of fact. We are not and should never be fact-finders.

or subject to one of the other exceptions recognized in cus-
tomary international law. If so, local exhaustion requirements
may be excused. But this is different from the plurality's pru-
dential exhaustion doctrine, which grants district courts dis-
cretion to decide whether or not to consider exhaustion in the
first place.

A mandatory requirement of exhaustion of local remedies,
except where futile or otherwise unavailable, allows our
courts to play the role the ATS intended them to play: an ulti-
mate venue for claimed violations of the law of nations when
those claimed violations cannot or will not be cured by the
courts of the country in which the injuries occurred. The
requirement simultaneously prevents our unelected judiciary,
which Hamilton observed in Federalist 78 should have "no
influence over either the sword or the purse," from assuming
the role of a roving sheriff in recurring, internecine disputes
involving claims of inequity and oppression outside the
United States. By interpreting the ATS not to include an
exhaustion requirement under the law of nations, but only in
the court's prudence, the plurality leaves the decision whether
an ATS plaintiff may reach American courts without exhaust-
ing his local remedies (or even showing such remedies are
futile) to turn on the discretion of the individual judge to
whom the case is randomly assigned. Then, as with most

---

Second, there appears to be such a factual dispute here. The declarations
on which Judge Reinhardt relies were signed on April 7, 2001—months
before the October 17, 2001 letter sent by the Papua New Guinean govern-
ment to the United States Ambassador, which mentioned the signing of a
recent peace agreement and objected to Sarei's action in the United States
on the ground Papua New Guinean law incorporates "a comprehensive
human rights regime consistent with the highest international standards,"
effects mechanisms that "enable citizens to secure their rights at law," and
ensures that Papua New Guinean courts continue their "proud record of
judicial independence." *See* Letter from Robert Igara, Chief Secretary to
the Government of Papua New Guinea, to Her Excellency Ms. Susan
Jacobs, Ambassador of the United States (Oct. 17, 2001), at 5.

questions of mixed fact and law, our review would likely be limited to whether the district court abused that discretion. The law of nations, as incorporated into the ATS, demands a more predictable application in our courts.

Therefore, although I agree with the plurality that the district court should consider whether Sarei exhausted his local remedies before allowing his action in the United States to proceed,[17] I would recognize that exhaustion requirement exists in the ATS statute itself. I would require the district court to consider (1) whether Sarei had local remedies and exhausted them and (2) whether such exhaustion would be futile or otherwise inadequate—not merely require the court to decide whether to conduct this two-step exhaustion analysis.

---

[17]I see four possible holdings: (1) exhaustion is never required; (2) as a matter of prudence, district courts have discretion to determine whether to conduct an exhaustion analysis; (3) as a matter of prudence, district courts have discretion to determine whether to conduct an exhaustion analysis, but under these facts it would be an abuse of that discretion not to conduct an exhaustion analysis, and (4) a district court is required by the ATS statute to conduct an exhaustion analysis. Judge Reinhardt's dissent adopts position (1), I adopt position (4), and I believe the plurality adopts position (2), as it directs the district court to "determine whether to impose an exhaustion requirement."

Thus, the position of the merits panel majority, echoed by Judge Reinhardt's dissent—that a court may address an ATS claim on the merits without ever even approaching the question of exhaustion of local remedies—is no longer good law in this circuit. Unfortunately, it appears the plurality holds the district court here has discretion not to conduct a two-step exhaustion analysis should it find one unnecessary due to prudential considerations. If the district court chooses to take the plurality up on this faulty offer, we may see this case again quite soon.

IKUTA, Circuit Judge, with whom Judge KLEINFELD joins, dissenting:

I write separately because I would affirm the dismissal of this case on the ground that we lack subject matter jurisdiction. Although I agree with the majority that in light of *Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004), a district court may consider whether to dismiss claims brought under the Alien Tort Statute (ATS), 28 U.S.C. § 1350, on the ground that the plaintiffs failed to exhaust remedies in the appropriate forum, I see no basis for holding that the district court here erred by failing to consider exhaustion before the other threshold issues on which it relied to dismiss this case (e.g., political question, act of state, and subject matter jurisdiction). The Supreme Court has made clear that "a federal court has leeway 'to choose among threshold grounds for denying audience to a case on the merits,' " and there is no mandatory sequencing of non-merits grounds for disposing of a case. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 127 S. Ct. 1184, 1191 (2007) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999), *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 100-01 n.3 (1998)).

Rather than return this case to the district court for consideration of this discretionary preliminary issue, I would affirm the dismissal of this case on the ground that we exceed the authority granted by Congress and the limits imposed by the Constitution's separation of powers by applying the ATS to a dispute not involving United States territory or citizens.

In *Sosa*, the Supreme Court established an approach for analyzing claims brought under the ATS. Although focusing on delineating the limited types of international law rules cognizable under the ATS, the Court noted other possible limitations on federal courts' jurisdiction, including deference to the political branches. *See* 542 U.S. at 727-28. As *Sosa* recognized, our obligation to interpret the ATS narrowly has constitutional underpinnings relating to the structural separation of

the federal powers and the primacy of the political branches in foreign affairs. *See id.* These separation of powers principles pervade our case law and clearly establish that decisions pertaining to foreign policy "are wholly confided by our Constitution to the political departments of the government, Executive and Legislative." *Chicago & S. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 111 (1948). "They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry." *Id.*; *see also Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention."); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952) ("It is pertinent to observe that any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference."). As stated by the Supreme Court in a related context, these principles "express[ ] the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964) (discussing the underlying separation of powers principles in the context of the Act of State doctrine).

These separation of powers principles, which are inherent in the Constitutional framework and which intrinsically demarcate a limited role for federal courts in foreign affairs, must inform our consideration of what Congress had in mind when it enacted the ATS and granted federal courts authority to consider certain claims alleging violations of international law. Although it may be difficult to determine the precise contours of Congressional intent, *see Sosa*, 542 U.S. at 719

("a consensus understanding of what Congress intended has proven elusive"), we must nevertheless strive to ascertain the outer bounds of that intent.

The historical context in which the ATS was enacted sheds additional light on this issue. When the First Congress enacted the ATS, it did so amidst concerns that the young nation had been "hamstrung by its inability to cause infractions of treaties, or of the law of nations to be punished" within the purview of the United States, *id.* at 716 (internal quotation marks omitted), and with a need "to assure the world that the new Republic would observe the law of nations." *Id.* at 722 n.15. As noted in *Sosa*, the "so-called Marbois incident" in which a French citizen assaulted the Secretary of the French Legion in Philadelphia, further intensified these concerns. *Id.* at 716. The nation's inability to vindicate France's interests led to protests from France and weak apologies from Congress. *Id.* at n.11. By enacting the ATS, Congress was attempting to reassure the community of States that federal courts were available to remedy those violations, such as assaults against ambassadors, "which impinged upon the sovereignty of . . . foreign nation[s] and if not adequately redressed could rise to an issue of war." *Id.* at 715; *see also Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 783 (D.C. Cir. 1984) (Edwards, J., concurring) ("There is evidence . . . that the intent of [the ATS] was to assure aliens access to federal courts to vindicate any incident which, if mishandled by a state court, might blossom into an international crisis."). In other words, the ATS gave federal courts an appropriate supporting role in the sphere of foreign affairs: facilitating the political branches' conduct of foreign relations by averting potential international crises that could arise from disputes involving a nexus to the United States. By providing a limited mechanism to vindicate the rights of aliens in these situations, the ATS authorized federal courts to assist the new nation in shouldering its responsibilities as a member of the international community.

This interpretation of the ATS is consistent with the "sparse contemporaneous cases and legal materials referring to the

ATS." *Sosa*, 542 U.S. at 720. As evidenced by the historical materials cited in *Sosa*, courts relied on the ATS as a source of federal jurisdiction only in cases involving some nexus to the United States, that is, only in cases implicating United States territory or citizens. For example, in *Bolchos v. Darrel*, 3 F. Cas. 810 (No. 1, 607) (S.C. 1795), the district court resolved two aliens' controversy regarding a prize capture in an American port. *Sosa*, 542 U.S. at 720. In *Moxon v. The Fanny*, 17 F. Cas. 942 (No. 9, 895) (D. Pa. 1793), the district court looked to the ATS for jurisdiction over a dispute involving a French privateer who seized a British ship in United States waters, but ultimately dismissed the action because the claim at issue was not " 'a suit for a tort only.' " *Sosa*, 542 U.S. at 720 (quoting *Moxon*, 17 F. Cas. at 948). Finally, in the 1795 opinion letter of Attorney General William Bradford, the Attorney General stated that the ATS would provide jurisdiction for the claims of those parties injured by "Americans who had taken part in the French plunder of a British slave colony in Sierra Leone." *Id.* at 721. I have found no case prior to the Second Circuit's reinvigoration (or reinvention) of the ATS in *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980) where federal courts have asserted jurisdiction under the ATS in a case lacking some nexus to the United States.

This historical evidence, read together with an understanding of the structural constraints placed on federal jurisdiction by separation of powers principles, strongly supports the conclusion that Congress did not afford the federal courts jurisdiction to preside over the claims presented in this case. Plaintiffs do not ask us to exercise jurisdiction to redress injuries that, if left unredressed, would be the subject of international discord between the United States and Papua New Guinea. *Cf. Tel-Oren*, 726 F.2d at 783 (Edwards, J., concurring) (ATS thought to apply where the failure of United States courts to vindicate an alien's civil rights would make the United States answerable to the alien's home state). Rather, plaintiffs ask us to adjudicate a dispute that falls far outside the realm of any historical ATS case, and to sit in judgment

over interactions that took place on foreign soil among a foreign company, a foreign government, and foreign citizens. Such an exercise of authority would encroach too far upon the province of the political branches, thrusting us into a situation rife with "risks of adverse foreign policy consequences," *Sosa*, 542 U.S. at 728, where we are asked to judge, rather than vindicate, the interests of a foreign sovereign. *See also id.* at 733 n.21. We are not entitled to read such an expansive grant of jurisdiction into the ATS, given Congress's presumed intent to honor the structural constitutional principle that "[t]he conduct of foreign relations of our government is committed by the Constitution to the executive and legislative — 'the political' — departments of the government." *Oetjen v. Central Leather Co.*, 246 U.S. 297, 302 (1918). We are thus bound to embrace a limited interpretation of the ATS—one that facilitates, rather than disrupts, our participation in the international state system.

In sum, in the absence of direction from Congress, we cannot read the ATS as authorizing an extension of jurisdiction to disputes lacking any nexus to United States territory, citizens, or interests. *See Sosa*, 542 U.S. at 726 ("[T]he general practice [for the Supreme Court] has been to look for legislative guidance before exercising innovative authority over substantive law. It would be remarkable to take a more aggressive role in exercising a jurisdiction that remained largely in shadow for much of the prior two centuries.").

In light of the narrow scope of Congress's grant of authorization in the ATS, as informed by constitutional separation of power principles, I would conclude that recognizing the torts in this case exceeds the power we have to recognize causes of action under the ATS, and we therefore lack jurisdiction to entertain these claims.

KLEINFELD, Circuit Judge, concurring:

I concur in the result reached by Judge McKeown's opinion, limited remand for consideration of whether exhaustion should be required. I do so because we must provide some clear direction to the district court, and only a result adopted by a majority can do so.

In my view, Judge Ikuta's dissent is correct, and I join in it fully. Even so, failure to exhaust is an additional reason for dismissal and need not conflict with the reasons for dismissal stated by Judge Ikuta.[1]

The issue of exhaustion arises only because the Alien Tort Statute has been stretched far beyond its purpose. Were it properly confined to what the term "the law of nations" generally meant when Congress passed the statute ("The principal offences against the law of nations . . . are of three kinds; [1.] violation of safe-conducts; 2. Infringement of the rights of [a]mbassadors; and 3. Piracy."[2] ), the issue of exhaustion would not arise. Imperialistic application of the term "law of nations" to whatever we American judges strongly disapprove of undermines the purpose of the law of nations, "that the peace of the world may be maintained."[3]

---

[1]*See Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 127 S. Ct. 1184, 1191 (2007).

[2]4 William Blackstone, *Commentaries on the Laws of England* 68 (1769) (*cited in Sosa v. Alvarez-Machain*, 542 U.S. 692, 724 (2004)).

[3]4 William Blackstone, *Commentaries on the Laws of England* 68 (1769).

REINHARDT, Circuit Judge, dissenting, joined by Judges PREGERSON, BERZON, and RAWLINSON:

The plurality opinion remands this action to the district court to consider whether this is a case in which prudential exhaustion analysis should be applied, and, if so, whether plaintiffs should be required to exhaust their remedies in Papua New Guinea before proceeding further in the district court. I note first that neither the Supreme Court nor any circuit court has ever imposed an exhaustion requirement, prudential or otherwise, on a case brought under the Alien Tort Statute (ATS), which was enacted in 1789. Because I do not think that the Supreme Court "counseled" us to adopt such a requirement, that there is anything about this case that makes it "an appropriate case" in which to consider doing so, or that we should require an exhaustion analysis in ATS cases when Congress has not included such a requirement in the statute, I dissent.

A.

The plurality's starting point is a footnote in *Sosa v. Alvarez-Machain*, in which the Supreme Court alluded to the issue of exhaustion of local remedies and stated: "We would certainly consider this requirement in an appropriate case." 542 U.S. 692, 733 n.21 (2004). The exhaustion argument had not been raised prior to the time that *Sosa* reached the Court, and even there it had not been raised except in an amicus brief. Contrary to the plurality's assertion, the footnote stating that the Court would consider the argument when it was properly raised certainly does not "signal" anything as to what the Court's ultimate position will be when the issue of exhaustion is properly before it. Even the Court does not know that until it reads the briefs, hears the arguments and carefully studies the issue, including the history of the statute.[1] Although the

---

[1]I would also not parse the words in the sentence as carefully as Judge Bea does and conclude that the Supreme Court would consider exhaustion as a requirement rather than a prudential case-specific inquiry. I doubt that the Court meant to infuse as much meaning into the one sentence as the plurality or the concurrence would like.

Court's footnote states that it would *consider* whether to adopt such a requirement, by no means did it advise lower courts to do so before it has had the opportunity to decide itself after the issue is properly presented to it — particularly as neither our court nor any other circuit court has heretofore found a need to limit ATS in this manner. *See, e.g.*, *Jean v. Dorelien*, 431 F.3d 776, 781 (11th Cir. 2005) (holding that the exhaustion requirement does not apply to ATS); *Hilao v. Estate of Marcos*, 103 F.3d 767, 778 (9th Cir. 1996) (applying exhaustion only under the Torture Victim Protection Act (TVPA)); *Kadic v. Karadzic*, 70 F.3d 232, 245 (2d Cir. 1995) (describing the exhaustion requirement only under the TVPA).

Moreover, I do not find convincing the plurality's assertion that this is the "appropriate case" for considering when, if ever, an exhaustion analysis should be undertaken. In fact, the record and the district court's interpretation of it make clear that this is not such a case. When plaintiffs filed their suit, their island of Bougainville "[had] been engaged in a civil war [involving] the [Papua New Guinean] government for the past ten years." *See Sarei v. Rio Tinto*, 221 F. Supp. 2d 1116, 1174 (C.D. Cal. 2002). They submitted declarations asserting that they or their families would be in danger if they had to bring their claims in the courts in Papua New Guinea. The lead plaintiff, Alexis Holyweek Sarei, for example, lived in the United States as a permanent resident at the time the action was filed and stated that he feared "grave harm" to himself and his family if he were to travel to Papua New Guinea to litigate the claims against Rio Tinto. Sarei Decl. ¶10 (ER 1948). Other plaintiffs located in Bougainville expressed similar concerns. *See, e.g.*, Tapuri Decl. ¶ 3 (ER 1932) ("I do not feel safe if I had to go to PNG to prosecute this case. I am one of Francis Ona's officers . . . Mr. Ona has been hunted by PNG forces, and a bounty placed on his head."); Bom Decl. ¶3 (ER 1938) ("I am related to Francis Ona . . . . PNG placed a K200,000 bounty on [Mr. Ona's] head [and] because of my relationship with Mr. Ona, I would fear for my life if

requested to go to PNG."). The district court denied the defendants' motion to dismiss for forum non conveniens, in part because it found that the plaintiffs "have adduced detailed declarations as to why they believe they would be in danger if they were forced to travel to Port Moresby [for trial.]" *See Sarei*, 221 F. Supp. 2d at 1173-74.[2]

As the plurality recognizes, there is a well-settled exception to the exhaustion requirement when the alternative local remedy is unavailable, ineffective, or futile. *See* Plurality op. at 16458-59. No rule of domestic or international law requires plaintiffs who are alleging serious violations of human rights to exhaust local remedies when there is evidence that plaintiffs would further risk their lives by doing so. *See Doe v. Qi*, 349 F. Supp. 2d 1258, 1319 (N.D. Cal. 2004) (excusing exhaustion requirement under the Torture Victim Protection Act (TVPA) when the complaint reveals that "those making allegations against the government could suffer 'serious reprisals' "); *Estate of Rodriguez v. Drummond Co., Inc.*, 256 F. Supp. 2d 1250, 1267-68 (N.D. Ala. 2003) (holding that the TVPA does not require exhaustion of local remedies when plaintiffs would be at risk of retaliation if they sought legal redress)*; Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 343 n.44 (S.D.N.Y. 2003) ("Whether or not the ATS generally requires exhaustion of local remedies, the Court is aware of no case . . . in which

---

[2]Footnote six of Judge Bea's concurrence is entirely incorrect. The declarations to which he refers were reviewed and expressly credited by the district court in making its ruling retaining jurisdiction in the United States, *see Sarei*, 221 F. Supp. 2d at 1174, notwithstanding the subsequent letter of October 17, 2001 which it reviewed before reaching its July 9, 2002 decision, *see id.* at 1202-03. All the necessary fact-finding has already been done by the district court.

The district court also found it unclear whether plaintiffs would be able to find legal representation in Papua New Guinea, and unlikely that they would be able to compel the production of critical witnesses and documents. *See id.* at 1174. On appeal, defendants did not challenge any of the findings referred to in this footnote.

plaintiffs were required to exhaust local remedies . . . where doing so would be futile and would put plaintiffs in great danger"). In fact, exhaustion is not a very high bar to suit for victims of human rights abuses: even in specifically requiring exhaustion under the TVPA, Congress explained that "in most instances the initiation of litigation under this legislation will be virtually prima facie evidence that the claimant exhausted his or her remedies in the jurisdiction in which the torture occurred" and that "courts should approach cases brought under the [TVPA] with this assumption." S. Rep. No. 102-249, at 9-10 (1991). Because, given their fears of retaliation, it is clear that plaintiffs would not need to exhaust their remedies in Papua New Guinea even under the TVPA, this is not an "appropriate case" to determine whether we should apply an exhaustion analysis in ATS cases. In fact, it may well be one of the least appropriate cases in which to do so.

B.

Were, contrary to fact, this the "appropriate case" in which to consider whether an exhaustion analysis should be applied in ATS cases, I would conclude that it should not. The en banc plurality, as well as the concurrence, errs by relying heavily on the general principle of exhaustion of local remedies under international law and ignoring the panel majority's warning that "we should not be lulled into a false sense of familiarity with the term 'exhaustion' just because it is the same term that we use to describe an analogous doctrine in our domestic law." *Sarei v. Rio Tinto*, 487 F.3d 1193, 1220 n.31 (9th Cir. 2007). There are many reasons why courts should be reluctant to transplant the exhaustion principle onto ATS, a statute that provides jurisdiction in United States courts for violations of international human rights norms that are specific, universal, and obligatory. *See Sosa*, 542 U.S. at 732 (citing *In re Estate of Marcos Human Rights Litigation*, 25 F.3d 1467, 1475 (9th Cir. 1994)).

Exhaustion of local remedies is a rule of customary international law that developed in the arena of diplomatic protection in order to protect the sovereignty of states at a time when international law recognized only the rights of states to protect its own citizens. *See* Chittharanjan Felix Amerasinghe, *Local Remedies in International Law* 22-42 (2d ed. 2004). The scope of the exhaustion rule is less settled, however, in the realm of international human rights, where the law recognizes the primacy of the fundamental rights of individuals and the interest of states other than the victims' own in guaranteeing such universal human rights. *See id.* at 67 ("[I]t would seem logically to follow from the recognition of the fact that individuals have fundamental human rights . . . that . . . there should be a presumption that violations of such rights should be susceptible of examination at an international level without the need for the exhaustion of local remedies.").[3] It may be, for example, that exhaustion is not required in the human rights context when a treaty does not specifically mandate it. *See* Amerasinghe, *supra*, at 66-68. *Restatement (Third) of Foreign Relations*, to which the plurality cites, does not state that exhaustion is required under international law to obtain remedies for violations of human rights obligations. It explains only that exhaustion of domestic remedies is required when a state is pursuing "formal, bilateral remedies" or when "international agreements providing remedies to individuals" require it. *See Restatement (Third) of Foreign Relations* § 703, cmt. d (1987). Neither circumstance applies to plaintiffs bringing ATS claims.

---

[3]*See also, e.g.*, Paula Rivka Schochet, *A New Role for an Old Rule: Local Remedies and Expanding Human Rights Jurisdiction Under the Torture Victim Protection Act*, 19 Colum. Hum. Rts. L. Rev. 223, 238 (1987) ("The unique features of human rights protection preclude a strictly parallel application of the customary local remedies rule."); A.A. Cançado Trindade, *Exhaustion of Local Remedies Under the U.N. Covenant on Civil and Political Rights and its Optional Protocol*, 28 Int'l & Comp. L.Q. 734, 765 (1979) (noting that in the context of the evolution of international protection of human rights, "the classic rule of prior exhaustion of local remedies needs to be reappraised.").

The exhaustion principle is even less established in the enforcement of international human rights norms in domestic courts against individuals and corporations, than in supranational tribunals against states. Exhaustion under international law governs the *vertical* or *hierarchical* relationship of courts — such as the relationship of international tribunals like the International Court of Justice and the Inter-American Court of Human Rights to domestic courts. *See Interhandel Case (Switz. v. U.S.)*, 1959 I.C.J. 6, 26 (Mar. 29) ("The rule that local remedies must be exhausted before *international proceedings* may be instituted is a well-established rule of customary international law.") (emphasis added); Emeka Duruigbo, *Exhaustion of Local Remedies in Alien Tort Litigation*, 29 Fordham Int'l L. J. 1245, 1275 (2006) ("Ordinarily, the rule of local remedies applies as a conflict rule; it is used to resolve conflicts of jurisdiction between municipal courts and international tribunals. So the rule usually applies in a vertical exercise of jurisdiction between national and international tribunals."). And when a case is brought in such international tribunals, the defendant is often the state. *See The Matter of Viviana Gallardo et al*, Series A., No. G 101/81, Inter-Am. C.H.R., Nov. 13, 1981, ¶ 26 ("[Exhaustion] . . . excuse[s] *the State from having to respond to charges before an international body* for acts imputed to it before it has had the opportunity to remedy them by internal means.") (emphasis added).

In adjudicating ATS claims, however, United States courts sit in *horizontal*, not vertical, relationship with courts of other countries that might exercise its jurisdiction over the same questions of international law as against individual defendants. The more appropriate point of comparison is therefore whether courts of other nations have imposed such a requirement before exercising universal jurisdiction. It appears that, for the most part, they have not. *See* Cedric Ryngaert, *Applying the Rome Statute's Complementarity Principle*, 19 Crim. L.F. 153, 175 (2008) (studying the principle of "subsidiarity" — in which a third-party state exercises universal jurisdiction

only when the state with a traditional basis of jurisdiction is unable or unwilling to investigate and prosecute an international crime — and concluding that "the absence of a conviction on the part of States that subsidiarity has the compelling force of law probably leads to the inevitable conclusion that the subsidiarity principle is not a norm of customary international law.").[4]

Our prior cases reflect that the exhaustion principle is not an accepted limitation on a litigant's ability to bring international law claims in the United States courts. Indeed, we have always resolved the question of competing jurisdiction with foreign courts through the forum non-conveniens analysis — not exhaustion. *See, e.g.*, *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422 (2007); *Altmann v. Republic of Austria*, 317 F.3d 954, 972 (9th Cir. 2002), *aff'd on other grounds by* 541 U.S. 677 (2004); *Cheng v. Boeing Co.*, 708 F.2d 1406 (9th Cir. 1983). The forum non conveniens doctrine grants courts the discretion to dismiss the case in consideration of the balance of private and public interests. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947). It applies to ATS cases and was addressed and rejected by the district court in this case. *See Sarei*, 221 F. Supp. 2d at 1164-78; *see also, e.g.*, *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 108 (2d Cir. 2000). I see no reason to deviate from our practice just because a principle of exhaustion exists in the international law of diplomatic protection or because some human rights treaties explicitly require exhaustion prior to bringing claims in international tribunals.

---

[4]Although the plurality argues that we should be careful about exercising jurisdiction because the basis for universal *civil* jurisdiction is not as well-settled as the basis for universal *criminal* jurisdiction, international law does not preclude "the application of non-criminal law on [the basis of universal jurisdiction.]" *Restatement (Third) of Foreign Relations* § 404 cmt. b. The plurality overstates the difference between the two types of jurisdiction, as in many countries "universal criminal jurisdiction necessarily contemplates a significant degree of tort recovery as well." *See Sosa*, 542 U.S. at 762-63 (Breyer, J., concurring).

Nor do I accept the view that prudential considerations favor the imposition of the exhaustion requirement, for many of the reasons already articulated by the panel majority. Most important, the individual and institutional interests in an ATS case weigh heavily against requiring exhaustion. ATS recognizes jurisdiction only for violations of "a norm of international character accepted by the civilized world" and "defined with a specificity" comparable to the 18th century norm prohibiting piracy. *Sosa*, 542 U.S. at 725. These are heinous offences like genocide, crimes against humanity, and war crimes. *Sosa*, 542 U.S. at 762 (Breyer, J., concurring). Individuals have an interest in obtaining a remedy for such injustices and the United States has an interest in punishing the "*hostis humani generis*, an enemy of all mankind," *Filartiga v. Pena-Irala*, 630 F.2d 876, 890 (2d Cir. 1980).

The exercise of ATS jurisdiction may, of course, at times trigger institutional concerns regarding sovereignty and comity. But we have an arsenal of judicial doctrines that protect the sovereignty interests of other countries or the foreign policy and comity interests of this country from judicial intervention: political question, act of state, sovereign immunity, and international comity, for example. In fact, one survey of the cases in 2004 found that approximately 80% of the human rights cases brought under ATS and TVPA since 1980 have been dismissed on the bases of these and other similar doctrines. *See* K. Lee Boyd, *Universal Jurisdiction and Structural Reasonableness*, 40 Tex. Int'l L.J. 1, 2 & n.6 (2004). Many of these doctrines have been raised in this case as well. I do not think that we need to create a new requirement of exhaustion in order to further restrict the availability of jurisdiction that Congress has granted.

Moreover, in this lawsuit, like many others, the defendants are not a sovereign state, or even officials of the state, but corporations based in the United Kingdom and Australia that are "part of an international group operating mines and processing plants in forty countries, including the United States."

Plurality op. at 16446. In such a case, the concern for sovereignty and comity is less pressing.[5] This brings us back to the point that even if the exhaustion analysis were to be applied, the plaintiffs here would not be required to exhaust their claim in Papua New Guinea, given all the circumstances, including those discussed in section A, *supra*.

I dissent for these reasons and for others set forth in the panel majority's opinion. *See Sarei*, 487 F.3d at 1213-24. In the context of ATS, there are persuasive reasons why "the balance [of interests] tips against judicially engrafting an exhaustion requirement onto a statute where Congress has declined to do so, and in an area of international law where the Supreme Court has called for the exercise of judicial caution rather than innovation." *Sarei*, 487 F.3d at 1219.

---

[5]This would also explain why Congress specifically required exhaustion under the TVPA, but not under ATS. TVPA imposes liability only when the individual acts "under actual or apparent authority, or color of law, of any foreign nation." 28 U.S.C. § 1350 note. Under ATS, however, private parties may be held liable so long as their conduct violates a well-established norm of international law — even if they are not state actors. *See Sosa*, 542 U.S. at 732 n.20; *Kadic*, 70 F.3d at 239.